UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-----------------------------------------------------------------X

EUROPEAN & TRANSATLANTIC CHARTERING APS, :

               :

       Plaintiff,         :

               :

   - against -           :

               :

WEST COAST LINE LTD. a/k/a WCL LIMITED,   :

(Owner of the M/V LUBAVA),       :

               :

       Defendant.        :

-----------------------------------------------------------------X

**08 CV 0865**

ECF CASE



JAN 2 4 2008

## VERIFIED COMPLAINT

Plaintiff, EUROPEAN & TRANSATLANTIC CHARTERING APS (hereinafter

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendant, WEST COAST LINE LTD. a/k/a WCL LIMITED

(Owner of the M/V LUBAVA) (hereinafter "Defendant"), alleges, upon information and belief,

as follows:

  1.   This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

  2.   At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law.

  3.   Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under foreign law and was at all material times the

Owner of the motor vessel "LUBAVA" (hereinafter the "Vessel").

4.    Pursuant to a charter party dated November 7, 2006, Defendant time-chartered the Vessel to Plaintiff. *Please find the charter party attached hereto as Exhibit "1."*

5.    During the course of the charter, on October 9, 2007, the Vessel's rudder suffered damages at Julianehaab, Greenland.

6.    As a result of the rudder damage, the Vessel proceeded to the Baltic for repairs which were to be for the Defendant's account.

7.    The Vessel's class certificate permitted the Vessel to keep trading until January 6, 2008.

8.    Pursuant to an Addendum to the Charter Party dated December 7, 2007, the parties agreed that Defendant could continue to trade the Vessel, notwithstanding the damage, in exchange for paying Plaintiff €30,000.00 (approximately $43,924.54) by December 21, 2007. *Please find attached hereto as Exhibit "2" the final wording of the December 7th Addendum.*

9.    Defendant continued to trade the Vessel as per the charter party and December 7th Addendum.

10.    However despite due demand, Defendant failed to pay the €30,000.00 in breach of the charter party and/or December 7th Addendum.

11.    In addition, while the Vessel was being repaired it was placed off-hire, which was to accrue for the Defendant's account.

12.    Defendant has failed to pay amounts due and owing under the charter party and/or December 7th Addendum, including but not limited, hire and/or off-hire, in the approximate sum of €121,232.75 (approximately $177,707.83).

13.    Pursuant to the charter party and/or the December 7th Addendum all disputes arising thereunder are to be submitted to arbitration in London with English law to apply.

14.    Despite due demand, Defendant has failed to pay the sums due and owing to Plaintiff.

15.    Plaintiff is preparing to commence arbitration proceedings against Defendant on its claims.

16.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs, including attorney's fees, arbitrator's fees, disbursements and interest are recoverable as an element of the Plaintiff's claim.

17.    As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s) and/or any judgments entered thereon:

| | | |
|---|---|---|
| A. | Principle damage claim: | $221,632.37 |
| B. | Estimated interest on claims: Approx. 3 years at 6.5%, compounded quarterly | $35,265.24 |
| C. | Estimated attorneys' fees and arbitration costs: | $55,000.00 |
| **Total** | | **$311,897.61** |

18.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

19.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and/or also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by

3

the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.      That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.      That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.      That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount **$311,897.61** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

E.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.      That this Court award Plaintiff its attorneys' fees and costs of this action; and

4

G.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: January 23, 2008
    Southport, CT

The Plaintiff,
EUROPEAN & TRANSATLANTIC
CHARTERING APS

By: _____

Nancy R. Peterson (NP 2871)
Patrick F. Lennon (PL 2162)
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
nrp@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
               )    ss.:    Town of Southport
County of Fairfield )

    1.     My name is Nancy R. Peterson.

    2.     I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

    3.     I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

    4.     I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information
and belief.

    5.     The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is business organization with no officers or directors now
within this District.

    6.     The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents
and/or representatives of the Plaintiff.

    7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      January 23, 2008
             Southport, CT

                                  Nancy R. Peterson

6

EXHIBIT "1"

SEABEAR SEASCOPE LTD
36 Cosway Street London NW1 5NT

FILED ORIGINAL

# Time Charter

## GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party,** made and concluded in *London* ........................................ 7th ..... day of *November* ........................... 19 *2006*
2 Between *WCL Limited, St Petersburg, Russia* .............................................................................................................................
3 Owners of the good *Baltic flag* ........... steamship/Motorship MV *"LUBAVA"* ....................... of abt. *4134 mt deadweight s/b an abt. 6,455 mt draft*
4 of *677 3326* ............ tons gross register, and *NT 1733* ........... tons net register, having engines of ..................... indicated horse power
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ............................................................................
6 at ... of about *198,740,* cubic feet bale capacity, and about *available for cargo throughout the currency of this Charter-Party see further vessel's*
7 *description.* tons of *2340* lbs.
8 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
9 allowing a minimum of fifty tons) on a draft of ................. feet ................. inches on ................. Summer freeboard, inclusive of permanent bunkers,
10 which are of the capacity of about *See further description attached.* tons of fuel, and capable of steaming, fully laden, under good weather
11 conditions about *11.0* .......................... knots on a consumption of about ............... tons of best Welsh coal -best grade fuel oil- best grade Diesel oil,
12 now ..........................................................................................................................................................................

13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for *and European and Transatlantic Chartering APS Charterers of the City of Halle, Denmark.*
14 about *a period upto 1st July 2007, with 15 days not inchopt* ........................................................................................................
15 ......................................................................................... within below mentioned trading limits.
16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining *ultimately* responsible for
17 the fulfillment of this Charter Party.
18 Vessel to be placed at the disposal of the Charterers, at *upon completion of discharge at Vera Cruz atlhatshine*
19 .....................................................................................................................................................................
20 in such dock or at such wharf or place (where the may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be
22 ready to receive cargo with cargospaces *washed, cleaned and dry as required for loading the cargo as fixed and tight,* clean swept holds and
23 tight, staunch, strong and in every way fitted for the service, having water ballast, winches and
24 donkey boiler with sufficient steam power, or if not equipped with donkey, then other power sufficient to run all the winches at one and the same
25 time (and with full complement of officers, seamen, *and* engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
26 dise, including petroleum or its products in proper containers, excluding *see Clause 55*
27 (vessel is not to be employed in the carriage of Live Stock, but Charterers to have the privilege of shipping small quantities of thereof, of thus is, the
    *The vessel shall be employed in such lawful trades between safe ports and safe places within trading limits as agreed herein but*
    *excluding, when out of season, White Sea, Black Sea, Azov Sea and the Baltic and/or other areas with such ice conditions which are*
    *not appropriate for the trades by the similar vessels having ice class E2 or equal to it, all necessary lifting and other equipment to be for*
    *account of Charterers)* in such lawful trades, between safe port and/or ports in British North
28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29 Mexico, and/or South America ........................................................... and/or Europe
30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence, between
31 October 31st and May 15th, Hudson Bay, and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,

EFSSBAR SEASCOPE LTD
To Thomas Street Lisdon, SW4 9PP

*Trading Limits: see Clause 31* ...................................................................................

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, *holds*, machinery and equipment for and during the service. *The Owners shall be bound to maintain the vessel's class as stated herein, national / international statutory / trading certificates required for the performance hereof throughout the period of the Charter-party. However, in no circumstances shall the Owners be responsible for procuring any additional documents and certificates being necessary for the performance of the current Charter-party in the particular country whose domestic acts and regulations impose on the Owners more extensive and onerous liability the prescribed by the Owners' classification society and/or international conventions and/or international acts being in force at the time of the trade.*

2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, *customary* Port Charges, Pilotages, Agencies, Commissions,

Coastal Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for orders for Charters for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations undergo because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow that the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current *Rotterdam* prices, *the vessel to be delivered/redelivered with abt. same quantity. ~~at the respective ports, the vessel~~* ~~to be delivered with not less than~~ ...................................... ~~tons and not more than~~ ~~tons.~~

................................... ~~tons and to be re-delivered with not less than~~ ...................................... ~~tons and not more than~~ ...................... tons.

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of **€ 4150 gross per day/pro rata incl. overtime/dubaili, less 2.5% total commissions including 1.25% address commission and 1.25% commission payable to Braemar Seascope Ltd.** ~~United States~~ Currency ~~per ton on vessel's total deadweight~~/light-carrying capacity, including bunkers and stores, on........................... ~~same as freeboard, per Calendar Month~~ commencing on and from the day of her delivery, as aforesaid, and until and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *dop anytime one part chopt conh/baltic na bergen, orland/kiel/paula, med, EC South America, US Gulf, Caribs only.* unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/10/8/5,3,2,1* days notice of vessel's expected date of re-delivery, and probable port.

5. Payment of said hire to be made *to bankers as per Cl.48 in Euros* ~~New York in cash in~~ ~~United States~~ Currency, semi-monthly *every 15 days* in advance, and for the last half month or

part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working-day~~ ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~ ~~to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements, at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *in port or at a place where ship's of a similar*

69 *size customarily are laying always safely that Charterers or their Agents may*
70 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
71 lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~
74 ~~paying Owners ........ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75 ~~incurred in the consequence of the carriage of passengers. Charterers are to bear such risk and expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, *tally, lash secure, unlash, discharge* and trim the cargo at their *risk,* expense *and liability* under the
79 supervision of the Captain, who is to sign Bills of Lading for
80 cargo as presented, in conformity with Mate's or ~~Tally Clerk's~~ receipts only.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of $18.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying *$ 5.00* at the current rate per meal, for all such victualling. *Monthly Representations fixed at $*
*350,-- payable either to ship or owners as decided. Communication to be paid as per owners bill or against issue $ 500,-- per month*
*payable to owners.*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *If required, before the vessel proceeds on the voyage, then*
*failing which the Charterers shall not hold the Owners and/or the Captain responsible for the damages to and/or losses of such cargo*
*arising out of the luck on the part of the Captain of the particular knowledge to how the particular cargo shall be treated*
*notwithstanding that such knowledge is commonly available to the Charterers and/or cargo traders involved in such kind of trade.*

91 ~~13. That the Charterers shall have the option of continuing this charter for a further period of ........~~
92 ~~on giving written notice direct to the Owners or their Agents ........ days previous to the expiration of the first named term, of any declared option.~~

93 14. That if required by Charterers, time not to commence before *06:01 hrs 13th November 2006.* ........ *days* ........ and should vessel
94 not have given written notice of readiness on or before *23:59 hrs 14th November 2006.* ........ ~~but not later than 4 p.m.~~ Charterers or
95 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

96 15. That in the event of the loss of time from deficiency *and/or default* of men or *deficiency of* stores, fire, breakdown or damages to hull,
97 machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire. *Bunker/savings in case of speed deficiency if any, may be off-set against time lost*
*en-route.*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and the dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106    purpose of saving life and property.

107    17. *BIMCO/LMAA Arbitration Clause as published on the official site of The London Maritime Arbitrators Association - www.*
*lmaa.org.uk - to be fully applicable to this charter-party.* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute~~
~~shall be referred to three persons at New York,~~

108 ~~one to be appointed by each of the parties hereto,~~ and the ~~third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110    18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or* sub-hire for any amounts due under this Charter, including
General Aver-

111    age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112    deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113    might have priority over the title and interest of the owners in the vessel.

114    19. That all direlicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115    Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F
of

116    York-Antwerp Rules 1974 ~~1994~~, *Owners and Charterers by mutual agreement stipulating as long as*
~~confined to London at such port or place in the United States or may be selected by the carrier, and as to matters not provided for by these~~

117    Rules, according to the *English Law.* ~~laws and usages at the port of New York.~~ In such adjustment disbursements in foreign currencies shall be
exchanged into

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign channel in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place at final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agent may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and shall be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers. New Jason Clause as attached.~~

132 ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

134    cost of replacing same at per last purchase price, to be allowed by Owners.

135    21. *During the performance of the current Charter-party Owners have an option to dock the vessel at a convenient place for the*
*purpose of maintaining her class and certificates as required by the Owners' classification society and/or international conventions*
*and/or international acts.*

*Owners to give chrs 30 days notice thereof. Vessel to be off hired in dgp last port prior docking port and owners to deliver vessel again*
*as same place. Case owners/charterers agree the delivery in a port other than that port where the vessel was off-hired, then for the*
*purpose of calculation of the off-hire period / bunker cost, point of the starting of off-hire to be an equivalent compensation as charterers*
*require the delivery of the vessel back from off-hire case alternative port of off-hire.*

136 ~~That to the vessel may be free time to time employed writes during the term of this Charter, Vessel is to be docked at a~~

137 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

138 ~~time of last painting, and payment of hire to be suspended until she is again in proper state for the service.~~

139

PENTTÄRÄ AKADASATOSA ALSO
SKOL Port, GPA, SANATE SO...

140    22.   Owners shall maintain the gear of the ship as fixed, providing gear (for all items cks) capable of handling lifts up to *maximum capacity in accordance with the description clause* thereto, also

141    providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide *greater available on board for handling such heavier lifts (its features are length 8 metres, weight 3.2 metres, SWL 56.8 metric tons), necessary gear for*

142    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *lights lanterns and oil as on board for*

143    night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144    Charterers to have the use on any gear on board the vessel.
145    23.   Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146    steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
147    deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148    port, or labour unions, prevent crew from driving winches, Steve Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149    insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, *if required, and any standby expenses which is a specified item directly related to the failure of the vessel's gear* and pay any loss of time occasioned.
150    *hereby if shore engines are used same to be for Owners' account and vested to remain fully on hire. In case of a crane breakdown - cost to be charged proportionally depending if 1 or 2 cranes are in default - cost for shore cranes never to exceed vessels daily hire (this is case of 2 cranes broken down).*

151    24.   It is also mutually agreed that this Charter is subject in all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153    etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154    of which are to be included in all bills of lading issued hereunder:
155
156                                                          U.S. A Clause Paramount
157    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
158    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
159    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
160    be repugnant to said Act to any extent, such term shall to such extent but no further.
161                                                          Both-to-Blame Collision Clause
162    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
163    Master, mariner, pilot or the servant of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
164    hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss
165    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
166    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
167    owners as part of their claim against the carrying ship or carrier.
168    25.   The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
169    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able to safely enter the
170    port or to get out after having completed loading or discharging.
171    26.   Nothing herein stated is to be construed as a detraise of the vessel to the Time Charterers. The owners to remain responsible for the
172    navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
173    27.   A commission of *1.25* 2 1/2 per cent is payable by the Vessel and Owners to *Bracmar Seascope Limited, London*

174    ·············································
175    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
       28.   An address commission of *1.25* 2 1/2 per cent payable to *European and Transatlantic Chartering APS, Copenhagen* on the hire earned
       and paid under this Charter.

*On behalf of Owners*

*On behalf of Charterers*

For and on behalf of
EUROPEAN DRY BULK & MATIC
CHARTERING

P. Knudsen

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "LUBAVA"
DATED LONDON, 7TH NOVEMBER 2006

## CLAUSE 29

If during currency of this charter-Party any expenditure is incurred by the charterers on behalf of the Owners, the Charterers shall have the right to recoup themselves in respect of such expenditure by way of specified deduction from any hire which may become due and payable under this Charter-Party but max. US$ 500 per port.

## CLAUSE 30

At or off ports, vessels crew are to open and close the hatches where and when required, if permitted by local regulations. Vessel to be shaped up as far as possible for commencement of loading/discharging immediately as from vessel's arrival at each port.

## CLAUSE 31

Trading limits always via gsp/b aa or vessel to trade to and from ports where she may not be always afloat but safe ground and where vessels of similar size and draft are accustomed to lay and trade in safety. WW trading excluding: Israel, Turkish occupied Cyprus, North Korea, Israel, Great Lakes, Aus, Cuba, always within IWL limits. White Sea in season is allowed. All U.N. sanctions/embargoes to be respected by the Charterers.

Charterers have the right, without owners consent, to direct vessel to ports or areas outside IWL and into war zones provided that charterers pay owners nett extra insurance premium for breaking of IWL limits and trading to war zones. Charterers to inform owners of their intentions as soon as vessel fixed for an employment involving breaking of limits and war zones enabling owners cover their extra insurances.

## CLAUSE 32

The Captain or one of his officers shall supervise the stowage of cargo throughout the loading. Nevertheless, the Charterers shall remain responsible for loss and/or damage caused to the vessel or to the Owners by cargo(s) being loaded contrary to the terms of the current Charter-party or by improper or careless bunkering or loading, stowing or discharging of cargo(s) or any other improper or negligent act on their part or that of their servants.

## CLAUSE 33

The Captain shall sign the Bills of lading and/or waybills for cargo as presented in conformity with Mate's receipts only. However, the Charterers have the option to sign Bills of lading and/or waybills made in the form suitable for them either on behalf of the Captain or on their own behalf, whatever the case may be. In case the Bills of lading and/or waybills are signed either by the Charterers on their own behalf or the agents/the Captain on the Charterers' behalf, the terms of such Bills of lading and/or waybills shall clearly specify the Charterers as the carrier having all rights and liabilities to the third parties as set out in their terms.

In any case, all Bills of lading and/or waybills issued under the current Charter-party shall be in strict conformity with the Mate's receipts only and without prejudice to the Owners' rights as agreed herein.

Charterers are to be responsible for the soonest release to owners upon their request copies of b/l and/or waybills and/or other relevant cargo documents

Bills of lading and/or waybills issued for or covering the deck cargo, as the case may be, shall be marked "deck cargo to be at the Charterers' risk, liability and expense".

1

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON. 7TH NOVEMBER 2006

### CLAUSE 33 – Cont'd

If the original Bills of lading are not available at the port(s) of discharging the Owners/the Captain will allow upon vessel's arrival immediate discharging of the cargo in the custody of the port agents with its no further release until the original Bills of lading have been presented to the port agent by the appropriate lawful holders. However, the cargo carried under waybills and/or straight Bills of lading can be immediately released by the Captain/the Owners in accordance with the Charterers' written instructions but against the Letter of Indemnity in the SKULD wording format issued by the Shippers or 'receivers' or 'voyage charterers' or 'time charterers' to the effect that the cargo in question shall be released to the named Receivers without presentation of the original Bills of lading and the Owners will not be held liable to the third parties for such act.

Notwithsatnding anything else to the contrary herein, all Bills of lading and/or waybills shall be without prejudice to this Charter-party and the Charterers shall indemnify the Owners against all consequences of liabilities which may arise out of any inconsistency between this Charter-party and any Bills of lading or waybills signed by the Charterers or by the Captain at their request.

### CLAUSE 34

The Owners are obliged to deliver end keep the vessel, her crew and anything pertaining hereto supplied with up to date and complete certificates and approval and equipment enabling the vessel and her crew to load, carry and discharge all permissible cargoes under this Charter-Party and bunkers within the trading limits allowed under this Charter-Party. It is the responsibility of the Master and Owners of the vessel to arrange for any special vaccination required at port of call and to keep on board corresponding valid certificates. Failing this, any time lost to be for Owners' account.

INTERNATIONAL LABOUR ORGANIZATION SAFETY CLAUSES:
It is understood that, if necessary, the vessel will comply with any and ell safety regulations and/or requirements in force at ports of loading and/or discharging particularly the docks regulations of the United Kingdom Factory and Workships Act, the United States Safety and Health Regulations for Longshoring, if called at ports governed by above mentioned regulations. In tie event of any delay to the vessel caused by the reason of the vessel's failure to meet any such safety regulations the vessel shall be off-hire for all time lost.

### CLAUSE 35

Owners to keep charterers harmless in the respect of the ITF concern.

### CLAUSE 36

The Owners Guarantee the vessel to be always safe in ballast without required any solid ballast.

### CLAUSE 37

Deleted

### CLAUSE 38

Charterers to have the liberty to slowspeed vessel at any speed acceptable to vessels' machinery but instructions to Master in writing only.

2

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 39

Deleted.

### CLAUSE 40

Master/Owners will act in accordance with Charterers' general instruction, as given on delivery.

### CLAUSE 41

Hold cleaning to be paid basis:  sweeping/removal dunnage – US$ 500,– per such cleaning and/or removal washing including sweeping/removal – US$ 750,– payable to master directly.

### CLAUSE 42

The Owners guarantee that the vessel is entered for full cover and shall remain entered for duration of the charter in a P + I Club. Cover shall include claim for cargo damage/shortage etc.

Owners PANDI Club is: Russian PANDI Club, controlled in Hamburg.

Owners also guarantee that for the whole duration of this contract the vessel will remain fully covered with a hull and machinery insurance.

### CLAUSE 43

Owners to supply valid deratting certificates on delivery of the vessel. Also valid health certificates covering crew and vessel and game has to cover the whole period of the timecharter. Cost for renewing same and detention to be for Owners' account.

### CLAUSE 44

The Charterers have the liberty of flying their own house flag.

### CLAUSE 45

After suspension of hire from any cause, vessel to be placed again at Charterers' disposal at the same port or position where hire was suspended unless otherwise agreed. If the vessel has been off hire for a total period of 60 days during this Charter Party, Charterers have the option to cancel the balance of the Charter Party provided there is no cargo on board.

### CLAUSE 46

Upon vessel's arrival at 1st loading port vessel to have clean/dry holds to Charterers and their Agents satisfaction. If bagged agriculture products are being loaded, then vessel to be thoroughly cleaned, washed and dried and vessel to be acceptable to the full satisfaction of U.S.D.A. and N.C.B. inspectors as ready in all respect in holds to receive such products.

### CLAUSE 47

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shorelabour and/or tug and/or pilot assistance because of the vessels flag or ownership or management or the wages or conditions of employment of her officers and or crew

3

## RIDER CLAUSES TO CHARTER PARTY OF
### M.V. "LUBAVA"
### DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 47 – Cont'd

or of the wages end,/or conditions of employment or because of the previous trading of the vessel or any other vessel as aforesaid, hire shall cease for the time thereby lost.

### CLAUSE 48

With reference to line 58 - hire to be telegraphically remitted to Owners bank being:

Beneficiary name: WCL Limited
Bank's address: LATEKO BANK, 21 E.Birznieka-Upisha Street, Riga, Latvia
Acc: LV34LATBC006020080134
SWIFT: LATBLV22

To offset errors Owners are to give the Charterers 48 hours grace before having the power to exercise their rights under Clause 5.

### CLAUSE 49 - PERFORMANCE CLAUSE

If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shell immediately investigate and take appropriate steps to correct the situation.

### CLAUSE 50

The Owners warrant that the vessel is suitable for grab discharge, as far as a tweendecker can be. Vessel has a full tweendeck on board. Charterers have the privilege to use bulldozers during loading and discharging provided weight of same does not exceed the tank top resp. tweendeck strength of the vessel. Charterers are not allowed lo use spider grabs.

### CLAUSE 51

Charterers and or their supercargo and/or their surveyor to have free access to the engine room and the bridge.

### CLAUSE 52

Owners grant that during the currency of this charter, they will comply fully with any legislation enacted in respect of oil pollution by any government, department thereof or other authority. If there is any delay to the vessel, or any extension of the voyage occurs from failure to comply with said aot, rules, regulations for oil pollution, the vessel to be considered off-hire for the period of such delay of extension.

### CLAUSE 53

Watchmen for the vessel to be for Owners' account, if ordered by the Master and for cargo to be Charterers' account, if ordered by Charterer. Compulsory watchmen or compulsory garbage removal at any port during this Charter Party to be for Charterers' account. Charterers have full cargo rights on and under deck - always within Master's discretion - in accordance with Department of Trade and Industry or equivalent authority regulations at loading pod(s). In the event of any dispute arising in connection with deck cargo, a Lloyds surveyor or equivalent to be appointed for charterers' account and his ruling to be binding on both parties. Cargo carried on deck without liability for loss and/or damage whatsoever caused.

4

**RIDER CLAUSES TO CHARTER PARTY OF**
**M.V. "LUBAVA"**
**DATED LONDON, 7TH NOVEMBER 2006**

### CLAUSE 54

In no case shall Charterers be responsible for any act of smuggling by any member of the crew and for stowaways. Any fines whatsoever applied to the vessel by the authorities and/or customs in connection with the above to be for Owners' account. In addition any time lost to be for Owners' account.

### CLAUSE 55

The below cargoes shall always be excluded:
Bone meals and bone scraps, livestock, asbestos or goods after asbestos forming, turnings and shavings, tar in bulk, asphalt in bulk (if drummed to be in new steel drums), bitumen, cement in bulk, oily scrap, motor blocks, directly reduced iron ore, hides, logs ex water, radioactive and nuclear materials except what is contained in measurement/medical instruments, zinc ash, glass in crates.

Charterers are permitted to load appendix-b cargoes as per the ship's valid certificate of compliance for the carriage of solid bulk cargoes, provided that requirements of the BC Code are observed.

For sulphur in bulk - if necessary charterers will arrange for whitewashing of holds should this be required by shippers and/or authorities.

If strapping/bagging is required charterers will arrange for same in their time and at their expense knowing that vessel has no grain bulkheads available.

Charterers are permitted to load all IMO classified cargoes (except IMO 7) provided same being loaded, stowed and discharged according to IMDG code.

Any extra equipment to be supplied and paid for by Charterers. I.M.O. Clause 7 always deleted except if part of equipment of Medicine/Oil Industry.

### CLAUSE 56

The Master shall keep a record of all Charterers' gear lashing materials, equipment and/or stores supplied by Charterers to the vessel end to maintain same in good condition. Such gear, lashing materials, equipment and/or stores shall be redelivered to Charterers prior to redelivery of the vessel to Owners, or, if requested by Charterers, at any time during the period of the charter in like good order and conditions (ordinary wear and tear excepted) Charterers to make their own arrangements with Master/Crew as to lashing/unlashing of cargo on and/or under deck.

### CLAUSE 57

Should the vessel, due to reason for which owners or their servants are to blame, be arrested during the currency of this Charter Party at the suit of any person having or purporting to have claim or any interest in the vessel, hire under this charter Party shall not be payable in respect of any period whilst the vessel remains unemployed as a result of such angst, i.e. the state to arrest having no bearing on hire unless the vessel be prevented from working thereby. If and when the vessel is off hire under this clause, bunker expenses for the off hire duration to be for Owners' account.

5

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 58

Owners agree to call Malongo terminal provided that charterers shall take out and, in their name and at their expenses, maintain at all material times and throughout the duration of these calls a policy of insurance with Lloyds underwriters in respect of loss and or damage to the vessel and for which charterers are legally liable up to vessel's normal insurance sum of EUR 2,500,000 the conditions of the insurance incl. the liability costs and expenses which may be incurred by the charterers by reason of delay, detention, loss of use or hire of the chartered vessel provides such losses follow an accident to the vessel for which the charterers are legally liable.

### CLAUSE 59

The charterers have the option to monitor the vessel's performance through a weather company, appointed by the Charterers at Charterers expense. Master to give passage information including coordinates, condition of the sea and wing, course and speed on the daily basis provided the same is the requested by the weather company in the due course.

### CLAUSE 60

New Jason Clause, Baltime 1939 War clause, Both-To-Blame Collision clause, to be considered fully incorporated in this Charter Party and be included as appropriate in Bills of Lading issued under this Charter Party. USA Paramount Clause, Canadian Clause Paramount or applicable Clause Paramount incorporated the Hague Visby Rules and Provisions for General Average to be incorporated in all Bills of Lading issued hereunder.

### CLAUSE 61

Any liability to third parties for cargo claims shall be borne by Head Owners, Disponent Owners and time Charterers, in accordance with the Inter-Club N.Y.P.E agreement, as amended May 1984. Under no circumstance may Charterers deduct or withhold any amounts from the T/C-hire for alleged cargo claims.

### CLAUSE 62

Deleted.

### CLAUSE 63

Charterers have the option to demand that Owner/Master fit one or more hatches with marine tape or equivalent tape. Such tape to be supplied and paid by the Charterers. The fitting of any tape to be carried out by the crew in accordance with instructions of tape manufacturers before vessels' sailing and same to be done in Charterers time and at Charterers expenses.

### CLAUSE 64

Charterers to be responsible for stevedoring damage. Should any damage be caused to the vessel of her fittings by the Charterers or their stevedores, the Master and/or the Owners shall give voyage as long as vessel is in the written notice to the Charterers and to the party having caused the damage, within 24 hours of occurrence, (or latest prior completion of each single voyage as long as vessel in the Malongo trade) failing which Charterers cannot be held responsible. Master to endeavour to obtain written acknowledgement of liability from the party

6

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

#### CLAUSE 64 – Cont'd

having caused the damage. Damage not affecting vessel's seaworthiness to be repaired at Owners' convenience. Damage affecting vessel's seaworthiness to be repaired whilst the vessel is on hire.

#### CLAUSE 65

Delivery and redelivery time to be calculated on the basis of GMT.

#### CLAUSE 66

Charterers' agent during this timecharter to attend to vessel's usual husbandry matters without charging any separate agency fee, Owners only paying actual expenses involved.

#### CLAUSE 67

If steelware cargos are taken by the Charterers for the carriage, The Charterers shall arrange preloading survey with the assistance of survey company which should be preliminary approved by the Owners' P and I insurers, with assistance of a P&I approved survey company.

#### CLAUSE 68

In no event shall Charterers procure or permit to be procured for the vessel any supplies, necessaries or services without previously obtaining a statement signed by an authorised representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of the Charterers and not on the credit of the vessel or of her Owners / Disponent Owners and that the furnisher claims no maritime lien on the vessel therefore.

#### CLAUSE 69

Any U.S. gross transportation tax - also referred to as the U.S. Tax Reform Act of 1986 -including later changes or amendments, levied on income attributable to transportation under this C/F shall be reimbursed by the Charterers. This is applicable as far as taxes on cargoes/freight and T/C hire payment to the vessel are concerned. Such taxes to be for Charterers' account.

#### CLAUSE 70

Basic War Risk Insurance Premium to be for charterers' account. If Angola involved, then any additional War Risk Premium to be for Charterers' account same not to exceed the Standard London Lloyds and to be settled against Underwriters invoice. Vessel's H & M value: € 2,500,000.

#### CLAUSE 71

Vessel's Description

"MV LUBAVA"

| | |
|---|---|
| EX NAME(S) | AFROSTAR |
| VSL'S IMO NUMBER | 8410354 |
| VSL'S TLX | 431266730, RUSSIAN CREW |
| VSL'S ICE CLASS | E2 (B1) |

7

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 71 – Cont'd

OWNERS' FULL STYLE     WCL LIMITED, BELIZE
CLASSIFICATION     GERMAN LLOYD
P&I COVERED BY     RUSSIAN P&I POOL

DIMENSION AND MAIN DATA

| | |
|---|---|
| LENGTH OVER ALL | 88.60m |
| LENGTH BETWEEN P.P. | 80.92m |
| BREADTH MOULDED | 15.67m |
| DEPTH TO MAIN DECK | 8.30m |
| DEADWEIGHT SUMMER | 4.134 |
| DRAFT SUMMER | 6.455m |
| GT/NT | 3120/1733 |

HOLD / HATCHES

| | |
|---|---|
| NUMBER OF HOLD / HATCHES | 1/1 |
| HOLD DIMENSIONS | 51,30x12,50x8,95m |
| TWEENDECK DIMENSIONS | 51,30x12,50x8,95m |
| GRAIN / BALE CAPACITY | 190740 cbft |

STEEL PONTOONS COULD BE USED AS OR CAN BE ERECTED IN THREE POSITIONS: 2700, 4250, 5800 mm FROM TANKTOP; EXCLUDED FORE SECTION OF TWEENDECK COVER, WHICH CAN BE ERECTED ONLY IN MID POSITION

CARGO GEAR

| | |
|---|---|
| TYPE | 2 MMF SLEWING CRANES, COMBINABLE |
| SWL/OUTREACH | 18t / 20.5m,24t / 15.5m,32t / 12.0m |

SITUATED     PORT SIDE

TANK CAPACITIES

| | |
|---|---|
| MDO | 280 mt |
| FRESHWATER | 66 mt |
| BALLAST WATER | 1483 mt |

MACHINERY

| | |
|---|---|
| MAIN-ENGINE | DEUTZ |
| AUX-ENGINE | 2KDH, 1KDH |
| SHAFT GENERATOR | 400KVA |
| BOW-THRUSTER | 184KW |

CONTAINER INTAKE

| | 20' | 40' |
|---|---|---|
| HOLD | 112 | 54 |
| DECK | 144 | 65 |
| TOTAL | 256 | 119 |

8

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

CLAUSE 71 – Cont'd

STABILITY EXAMPLES

14TS HOMOG. WEIGHT: 176'

DECK STRENGTH

| | |
|---|---|
| TANKTOP | 10MT/M2 |
| HATCH-COVER | 1.5MT/M2 |
| TWEENDECK | 2.0MT/M2 |

SPEED/CONSUMPTION

-SPEED/CONSUMTION:   ABT 11.0 KNOTS ON ABT 6.3 MT MDO, WIND UP TO MAX 3 AS PER BEAUFORT, NO ADVERSE CURRENT, BUT IAC NOT MORE THAT 34DEG TEMP OF THE SEA WATER

-VESSEL BURNING MGO FOR M/E AND HAVE WORKING AUXILARIES ON APPROACHES, SHALLOW WATERS, CONGESTED WATERS, STORMY SEA

-PLUS 0,2 MGO PER DAY FOR BOILER
-IN PORT WITHOUT GEAR  0.5MT MGO
-IN PORT WITH GEAR   1.5MT MGO

BUNKER SPECIFICATION

MGO-DMA SULPHUR WITH MAX 0,2 AS PER ISO 8217 1996 (e)
MDO-DMB BRIGHT AS PER ISO 8217 1996 (e)

ELECTRIC VENTILATION IN HOLD

26 AIR CHANGES PER HOUR BASIS EMPTY HOLDS

ADA & WOG

Owners further confirm that:

Tweendeck covers can be used like the bulkheads, but not as grain bulkheads since there is no parts which are composing bulkheads up to the full height of the hold.

There are no co2 fittings in the hold.

All IMO subject to the observation of the IMDG code requirements on the stowage and segregation.

Vessel is fitted with all SOLAS required means of the communication for the GL Class satisfaction including Inmarsat C (Telex). Vessel fitted with Inmarsat Mini M on board (Fax, Telephone) but same is not activated for reasons.

Vessel to be fully fitted with all container lashing equipment. Vessel to be fitted with semi automatic twist-locks on delivery or latest when being ordered to proceed to USA provided container cargo is nominated.

9

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 71 – Cont'd

Vessel is steel floored.

Vessel to be able to load full homogenous cargo in hold to vessels dwcc without water ballast.

On vessel constants owners advise: awaiting from the master exact, but owners for the safe load calculate 150mt total for stores, spares, constants.

### CLAUSE 72

Deleted.

### CLAUSE 73

This fixture to be kept strictly private and confidential.

### CLAUSE 74

Vessel not to be sold during duration of this c/p.

### CLAUSE 75

"BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005 Edition Jun 2005" to apply on this Charter Party.

### CLAUSE 76

"BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties Edit. Apr 2004" to apply on this Charter Party.

### CLAUSE 77

The Charterers have the option to apply to the Owners for the matter of changing the name of the vessel and such option shall be exercised by the Owners at the Charterers' time an expense provided that the appropriate authorities of the flag and/or bankers having a mortgage on the vessel give joint permission to do this.

All costs and expenses incurred by the Owners in relation to class work, re-issue of class certificates, statutory certificates and the vessel's documents, re-issue of the licenses and additional audit of the vessel in the respect of the ism plus ISPS, security plans review and change of the name in the mortgage, interest of the bank and any other work done by the Owners on behalf of the Charterers shall be at the Charterers' time and expense. The Charterers shall advance the Owners with sufficient funds covering the estimated volume of work to be done in relation to such change. Time lost by the vessel for the above as well to be for the charterers account.

Charterers is responsible, at their time and expense to arrange returning previous name of the vessel prior to the redelivery, provided owners request the same but not later than 15 days prior to estimated ship's redelivery date.

10

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 78

Crew Services

Charterers have the right on agreement of the master to use vessels crew for driving of cranes against US$ 9,-- per man per hour payable directly to master, in an way such services is subject to the term that permitted by the local regulation / authorities, customary for such ports for the such type/size of the vessel. Owners are not responsible for any certification for the such crew and crew working as charterers servants. Driving of cranes for larger pieces to be mutually agreed with master.

### CLAUSE 79

Reefer Container Clause

The Owners shall be responsible for the provisions of electrical power only. The Owners shall endeavour to monitor and record the performance of all such units whilst onboard the vessel in accordance with the Charterers' written instructions and to try to repair and rectify any breakdown, fault, or deficiency which may occur in respect of such units using the resources on board the vessel provided there is Crew available and weather permitting. If repair works are performed, all expenses, spares including Crew man hours shall be for the account of the Charterers and the vessel's Crew shall always be considered as Charterers' servants. If such    resources are insufficient, the Owners shall immediately notify the Charterers so that they may take action to obtain any required spares. Charterers to undertake to load/carry only reefer containers in good working conditions having passed a 'pre-trip inspection' by a recognised reefer service company before stuffing and will provide Owners/vessel with thereof on request. In no case shall the Owners and/or Master and/or vessel's Crew be responsible for proper functioning of reefer apparatuses and/or the conditions of the cargo inside the containers.

### CLAUSE 80

No tweendeck pontoons to be loaded under bulk cargo, but it permitted that tweendeck pontoons are stacked all in one stack from mid position up to the top of the coaming as not to be covered with the cargo (not to be stacked on tanktop and more that in one stack) or been erected in the vertical position to serve as bulkheads for the grades separation except on last cover when stacked in hold. It must be understood that the tweendeck can be stacked in hold when loading bulk cargo, but charterers agree not to floor out the tweendeck on tanktop.

### CLAUSE 81
*unagesdus*
All ~~messages~~ send on board to be copied to oper@wcl-ship.com.

### CLAUSE 82

Owners agree to discuss only Owners matters of ships business with Charterer's appointed port agents such as repatriation, spares, cash, b/l's, authorities, damages etc. items which belongs to owners, but not to chartering business such as demurrage rates, freights and other similar items respectively arrangements for loading and/or discharge or other port operation related issues.

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CEDARBAUM

-----------------------------------------------------------------X

EUROPEAN & TRANSATLANTIC CHARTERING APS, :

08 CV 0865

              Plaintiff,          :

        ECF CASE

- against -              :

WEST COAST LINE LTD. a/k/a WCL LIMITED,  :
(Owner of the M/V LUBAVA),        :

              Defendant.      :

JAN 2 4 2008

U.S.D.C. S.D. N.Y.
CASHIERS

-----------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, EUROPEAN & TRANSATLANTIC CHARTERING APS (hereinafter

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendant, WEST COAST LINE LTD. a/k/a WCL LIMITED

(Owner of the M/V LUBAVA) (hereinafter "Defendant"), alleges, upon information and belief,

as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.    At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law.

3.    Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under foreign law and was at all material times the

Owner of the motor vessel "LUBAVA" (hereinafter the "Vessel").

4.    Pursuant to a charter party dated November 7, 2006, Defendant time-chartered the Vessel to Plaintiff. *Please find the charter party attached hereto as Exhibit "1."*

5.    During the course of the charter, on October 9, 2007, the Vessel's rudder suffered damages at Julianehaab, Greenland.

6.    As a result of the rudder damage, the Vessel proceeded to the Baltic for repairs which were to be for the Defendant's account.

7.    The Vessel's class certificate permitted the Vessel to keep trading until January 6, 2008.

8.    Pursuant to an Addendum to the Charter Party dated December 7, 2007, the parties agreed that Defendant could continue to trade the Vessel, notwithstanding the damage, in exchange for paying Plaintiff €30,000.00 (approximately $43,924.54) by December 21, 2007. *Please find attached hereto as Exhibit "2" the final wording of the December 7th Addendum.*

9.    Defendant continued to trade the Vessel as per the charter party and December 7th Addendum.

10.    However despite due demand, Defendant failed to pay the €30,000.00 in breach of the charter party and/or December 7th Addendum.

11.    In addition, while the Vessel was being repaired it was placed off-hire, which was to accrue for the Defendant's account.

12.    Defendant has failed to pay amounts due and owing under the charter party and/or December 7th Addendum, including but not limited, hire and/or off-hire, in the approximate sum of €121,232.75 (approximately $177,707.83).

13.    Pursuant to the charter party and/or the December 7th Addendum all disputes arising thereunder are to be submitted to arbitration in London with English law to apply.

2

14.     Despite due demand, Defendant has failed to pay the sums due and owing to
Plaintiff.

15.     Plaintiff is preparing to commence arbitration proceedings against Defendant on
its claims.

16.     Under English law, including but not limited to Section 63 of the English
Arbitration Act of 1996, costs, including attorney's fees, arbitrator's fees, disbursements and
interest are recoverable as an element of the Plaintiff's claim.

17.     As best as can now be estimated, Plaintiff expects to recover the following
amounts in the Final Arbitration Award(s) and/or any judgments entered thereon:

| | | |
|---|---|---|
| A. | Principle damage claim: | $221,632.37 |
| B. | Estimated interest on claims:<br>Approx. 3 years at 6.5%, compounded quarterly | $35,265.24 |
| C. | Estimated attorneys' fees and arbitration costs: | $55,000.00 |
| **Total** | | **$311,897.61** |

18.     The Defendant cannot be found within this District within the meaning of
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal
Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during
the pendency of this action, assets within this District and subject to the jurisdiction of this Court,
held in the hands of one or more garnishees which are believed to be due and owing to the
Defendant.

19.     The Plaintiff seeks an order from this court directing the Clerk of Court to
issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental
Rules for Certain Admiralty and Maritime Claims, and/or also pursuant to the United States
Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by

3

the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and
to secure the Plaintiff's claim as described above.

**WHEREFORE,** Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear
and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That the Court retain jurisdiction to compel the Defendant to arbitrate in
accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C. That since the Defendant cannot be found within this District pursuant to
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue
an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment
pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also
pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels,
credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any
other funds held by any garnishee within the District which are due and owing to the Defendant,
in the amount **$311,897.61** calculated to date to secure the Plaintiff's claims, and that all persons
claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty
Rule B answer the matters alleged in the Complaint;

D. That this Court recognize and confirm any arbitration award(s) or judgment(s)
rendered on the claims set forth herein as a judgment of this Court.

E. That this Court retain jurisdiction over this matter through the entry of any
judgment or award associated with any of the claims currently pending, or which may be
initiated in the future, including any appeals thereof;

F. That this Court award Plaintiff its attorneys' fees and costs of this action; and

4

G.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: January 23, 2008
        Southport, CT

The Plaintiff,
EUROPEAN & TRANSATLANTIC
CHARTERING APS

By: _____

Nancy R. Peterson (NP 2871)
Patrick F. Lennon (PL 2162)
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
nrp@lenmur.com

5

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )   ss.:   Town of Southport
County of Fairfield  )

1.   My name is Nancy R. Peterson.

2.   I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.   I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.   I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.   The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is business organization with no officers or directors now

within this District.

6.   The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.   I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      January 23, 2008
            Southport, CT

                                    Nancy R. Peterson

6

EXHIBIT "1"

BRAEMAR SEASCOPE LTD
35 Cosway Street London NW1 5BT

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party**, made and concluded in *London* .......................................... *7th* ...... day of *November* .......................................... 19 *2006*

Between *WCL Limited, St Petersburg, Russia*, .......................................................................................................

Owners of the good *Steamship/*Motorship *MV "LUBAVA"* .......................... of abt. *4134 mt deadweight s/b on abt. 6.455 m draft*

of *GT 3120* .............. tons gross register, and *NT 1733* .............. tons net register, having engines of .......................... indicated horse power

and with hull, machinery and equipment in a thoroughly efficient state, and classed .......................................................................................................

*description. tons of 2.240 lbs.* an of about *190, 740* cubic feet bale capacity, and about *available for cargo throughout the currency of this Charter-Party see further vessel's*

deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity, allowing a minimum of fifty tons) on a draft of .................... feet .................... inches on .................... Summer freeboard inclusive of permanent bunkers, which are of the capacity of about *See further description attached.* tons of fuel, and capable of steaming, fully laden, under good weather conditions about *11.0* .......................... knots on a consumption of about .......................... tons of *best grade Welsh coal* - best grade fuel oil - best grade Diesel oil,

now .................................................... and *European and Transatlantic Chartering APS Charterers of the City of Hohe, Denmark* ..

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for about a *period upto 1st July 2007, with 15 days mol inclopt* .......................................................................................................

.......................................................... within below mentioned trading limits.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining *ultimately* responsible for the fulfillment of this Charter Party.

Vessel to be placed at the disposal of the Charterers, at *upon completion of discharge at Vera Cruz advestime*

in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as the Charterers may direct, if such dock, whart or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be ready to receive cargo with cargo spaces washed, cleaned and dry as required for landing the cargo as fixed and tight, clean swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time (and with full complement of officers, seamen, *and* engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, including petroleum or its products, in proper containers, excluding *see Clause 55.* .......................................................................................................

*(vessel is not to be employed in the carriage of* Live Stock but Charterers are to have the privilege of shipping a small number on deck at their risk, *The vessel shall be employed in such lawful trades between safe ports and safe places within trading limits as agreed herein but excluding, when out of season, White Sea, Black Sea, Azov Sea and the Baltic and/or other areas with such ice conditions which are not appropriate for the trades by the similar vessels having ice class E2 or equal to it.* all necessary fittings and other requirements to be for account of Charterer(s), in such lawful trades, between safe port and/or ports in British North

America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, under South America and/or Africa, and/or Asia and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season; White Sea, Black Sea and the Baltic,

REEDEMAAR SEASCOPE LTD

*Trading Limits: see Clause 31*

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular stopping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient state in hull, *holds*, machinery and equipment for and during the service. *The Owners shall be bound to maintain the vessel's class as stated herein, national / international statutory / trading certificates required for the performance hereof throughout the period of the Charter-party. However, in all circumstances shall the Owners be responsible for procuring any additional documents and certificates being necessary for the performance of the current Charter-party in the particular country whose domestic acts and regulations impose on the Owners more extensive and onerous liability than prescribed by the Owners' classification society and/or international conventions and /or international acts being in force at the time of the trade.*

2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, *customary* Port Charges, Pilotages, Agencies, Commissions,

Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current *Rotterdam* prices, *the vessel to be delivered/re-delivered with abt. same quantity.* in the respective port, ~~the vessel to be delivered with not less than~~ ~~tons and to be delivered with not less than~~ ~~tons and not more than~~ ~~tons.~~

4. That the Charterers shall pay for the use and hire of the said vessel at the rate of € 4150 gross per day/pro rata incl. overtime/luboil, less 2.5% total commissions including 1.25% address commission and 1.25% commission payable to Braemar Seascope Ltd. ~~United States Currency~~ per ton on vessel's total deadweight carrying capacity, including bunkers and ~~stores, on~~ ~~summer freeboard, per~~ Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *dop anytime one port chopt cont/baltic inc bergen, orlund/R/aipeda, med, EC South America, US Golf, Carlbs only.* unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/10/8/5,3,2,1 days* notice of vessels expected date of re-delivery, and probable port.

5. Payment of said hire to be made *to bankers as per CL.48 in Euros* New York in cash in United States Currency, *semi-monthly every 15 days* in advance, and for the last month or

part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working-day following that on which written notice of readiness has given to Charterers or their Agents before 4 p.m. but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.

6. That the cargo or cargoes be laden and/or discharged in any dock and/or at any wharf or at any wharf or place *in part or at a place where ship's of a similar*

ᴘᴇʀᴇɢʀɪɴᴀ ꜱᴇᴀᴄᴀʀʀʏ ʟᴛᴅ

*size customarily are laying always safely* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~ ~~paying Owners ................. per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~ ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency, and Charterers are to load, stow, *tally, lash secure, unlash, discharge* and trim the cargo *at their risk,* expense *and liability* under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or ~~Tally Clerk's~~ receipts *only*.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying $ *5.00* at the current rate per meal, for all such victualling. *Monthly Representations fixed at $ 350,— payable either to ship or owners as decided. Communication to be paid as per owners bill or against lsum $ 500,— per month payable to owners.*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo. *If required, before the vessel proceeds on the voyage, then detailed written instructions with regard to the treatment of every particular cargo shall be given to the Captain by the Charterers, failing which the Charterers shall not hold the Owners and/or the Captain responsible for the damages to and/or losses of such cargo arising out of the lack on the part of the Captain of the particular knowledges to how the particular cargo shall be treated notwithstanding that such knowledge is commonly available to the Charterers and/or traders involved in such kind of trade.*

13. ~~The tide Charterers shall have the option of continuing this charter for a further period of~~ ...................................................................................

~~on giving written notice thereof to the Owners or their Agents~~ ................................... ~~days previous to the expiration of the first named term, or any declared option,~~ ~~.............~~

14. That if required by Charterers, time not to commence before *00:01 hrs 13th November 2006* ............................... ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15. That in the event of the loss of time from deficiency *and/or* default of men or deficiency *of* stores, fire, breakdown, or damages to hull, machinery or equipment,

grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire. *Bunkersavings in case of speed deficiency if any, may be off-set against time lost en-route.*

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

CITY... (illegible stamp)

106 purpose of saving life and property.

107 17. *BIMCO/LMAA Arbitration Clause as published on the official site of The London Maritime Arbitrators Association - www.*
*lmaa.org.uk - to be fully applicable to this charter-party.* ~~This should any dispute arise between Owners and the Charterers, the matter in dispute~~
~~shall be referred to three persons at New York,~~

108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or sub-hire* for any amounts due under this Charter, including

    General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London,* according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F

    of
116 York-Antwerp Rules 1974 1924, *Owners and Charterers by mutual agreement Owners respecting subcontracts stipulating as long as*
    *confined to London* ~~at each port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~
117 Rules, according to the *English Law,* ~~laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be~~
    ~~exchanged into~~
118 ~~United States money at the rate prevailing on the date made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such disbursement of such cargo. Such cash deposit as the carrier~~
120 ~~or his agents may deem sufficient to additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
121 ~~required, be made by the goods, shippers, consignees, or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
122 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
123 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
124 ~~United States money.~~
125 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
126 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
127 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
128 ~~losses, or expenses of a general nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
129 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
130 ~~ships belonged to strangers. New Jason Clause as attached.~~
131 ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~
132 20. Fuel used by the vessel while on off-hire, also for cooking, condensing water, or for grates and stoves to be agreed to as in quantity, and the
133 cost of replacing same *as per last purchase price,* to be allowed by Owners.
134 21. *During the performance of the current Charter-party the Owners have an option to dock the vessel at a convenient place for the*
135 *purpose of maintaining her class and certificates as required by the Owners' classification society and/or international conventions*
    *and/or international acts.*

    *Owners to give clays 30 days notice thereof. Vessel to be off hired to dep last port prior docking port and owners to deliver vessel again*
    *as same place. Case owners/charterers agree the delivery in a port other than that port where the vessel was off-hired, then for the*
    *purpose of calculation of the off-hire period / bunker cost, point of the starting of off-hire to be an equivalent compensation as charterer*
    *require the delivery of the vessel back from off-hire case alternative port of off-hire.*
    ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138

139

140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to *maximum capacity in accordance with the description clause* three tons, also

141    providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide *spreader available on board for handling such heavier lifts (six features are length 8 metres, weight 3.2 metres, SWL 56.8 metric tons)*, necessary gear for

142    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *lights* lanterns and oil as on *board* for

143    night work, and vessel to give use of electric light when so fitted, but any additional lights over these on board to be at Charterers' expense. The

144    Charterers to have the use of any gear on board the vessel

145    23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146    stemer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,

147    deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the

148    port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or

149    insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, *and any standby expenses which is a specified item directly related to the failure of the vessel's gear* and pay any loss of time occasioned,

150    *thereby if shore engines are used same to be for Owners' account and vessel to remain fully on hire. In case of a crane breakdown - cost to be charged proportionally depending if 1 or 2 cranes are in default - cost for shore cranes never to exceed daily hire (this is case of 2 cranes broken down).*

151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;

153    etc." in respect of all cargo shipped under this charter to or from the United States of America, it is further subject to the following clauses, both

154    of which are to be included in all bills of lading issued hereunder.

155    <u>U. S. A. Clause Paramount</u>

156    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April

157    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of

158    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

159    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160    Both-to-Blame Collision Clause

161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the

162    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried

163    hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss

164    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-

165    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her

166    owners as part of their claim against the carrying ship or carrier.

167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169    port or to get out after having completed loading or discharging.

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171    navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172    27. A commission of *1.25* 2 1/2 per cent is payable by the Vessel and Owners to **Braemar Seascope Limited, London**

173

174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of *1.25* 2 1/2 per cent payable to **Euroglen and Transatlantic Chartering APS, Copenhagen** on the hire earned and paid under this Charter.

*On behalf of Owners*

*On behalf of Charterers*

Signed on behalf of
EUROCEAN TRANSATLANTIC
CHARTERING

P. Knudsen

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

RIDER CLAUSES TO CHARTER PARTY OF
M.V. "LUBAVA"
DATED LONDON, 7TH NOVEMBER 2006

## CLAUSE 29

If during currency of this charter-Party any expenditure is incurred by the charterers on behalf of the Owners, the Charterers shall have the right to recoup themselves in respect of such expenditure by way of specified deduction from any hire which may become due and payable under this Charter-Party but max. US$ 500 per port.

## CLAUSE 30

At or off ports, vessels crew are to open and close the hatches where and when required, if permitted by local regulations. Vessel to be shaped up as far as possible for commencement of loading/discharging immediately as from vessel's arrival at each port.

## CLAUSE 31

Trading limits always via gsp/b aa or vessel to trade to and from ports where she may not be always afloat but safe ground and where vessels of similar size and draft are accustomed to lay and trade in safety. WW trading excluding: Israel, Turkish occupied Cyprus, North Korea, Israel, Great Lakes, Aus, Cuba, always within IWL limits. While Sea in season is allowed. All U.N. sanctions/embargoes to be respected by the Charterers.

Charterers have the right, without owners consent, to direct vessel to ports or areas outside IWL and into war zones provided that charterers pay owners nett extra insurance premium for breaking of IWL limits and trading to war zones. Charterers to inform owners of their intentions as soon as vessel fixed for an employment involving breaking of limits and war zones enabling owners cover their extra insurances.

## CLAUSE 32

The Captain or one of his officers shall supervise the stowage of cargo throughout the loading. Nevertheless, the Charterers shall remain responsible for loss and/or damage caused to the vessel or to the Owners by cargo(s) being loaded contrary to the terms of the current Charter-party or by improper or careless bunkering or loading, stowing or discharging of cargo(s) or any other improper or negligent act on their part or that of their servants.

## CLAUSE 33

The Captain shall sign the Bills of lading and/or waybills for cargo as presented in conformity with Mate's receipts only. However, the Charterers have the option to sign Bills of lading and/or waybills made in the form suitable for them either on behalf of the Captain or on their own behalf, whatever the case may be. In case the Bills of lading and/or waybills are signed either by the Charterers on their own behalf or the agents/the Captain on the Charterers' behalf, the terms of such Bills of lading and/or waybills shall clearly specify the Charterers as the carrier having all rights and liabilities to the third parties as set out in their terms.

In any case, all Bills of lading and/or waybills issued under the current Charter-party shall be in strict conformity with the Mate's receipts only and without prejudice to the Owners' rights as agreed herein.

Charterers are to be responsible for the soonest release to owners upon their request copies of b/l and/or waybills and/or other relevant cargo documents

Bills of lading and/or waybills issued for or covering the deck cargo, as the case may be, shall be marked "deck cargo to be at the Charterers' risk, liability and expense".

1

## RIDER CLAUSES TO CHARTER PARTY OF
### M.V. "LUBAVA"
### DATED LONDON, 7TH NOVEMBER 2006

#### CLAUSE 33 – Cont'd

If the original Bills of lading are not available at the port(s) of discharging the Owners/the Captain will allow upon vessel's arrival immediate discharging of the cargo in the custody of the port agents with its no further release until the original Bills of lading have been presented to the port agent by the appropriate lawful holders. However, the cargo carried under waybills and/or straight Bills of lading can be immediately released by the Captain/the Owners in accordance with the Charterers' written instructions but against the Letter of Indemnity in the SKULD wording format issued by the Shippers or 'receivers' or 'voyage charterers' or 'time charterers' to the effect that the cargo in question shall be released to the named Receivers without presentation of the original Bills of lading and the Owners will not be held liable to the third parties for such act.

Notwithsatnding anything else to the contrary herein, all Bills of lading and/or waybills shall be without prejudice to this Charter-party and the Charterers shall indemnify the Owners against all consequences of liabilities which may arise out of any inconsistency between this Charter-party and any Bills of lading or waybills signed by the Charterers or by the Captain at their request.

#### CLAUSE 34

The Owners are obliged to deliver end keep the vessel, her crew and anything pertaining hereto supplied with up to date and complete certificates and approval and equipment enabling the vessel and her crew to load, carry and discharge all permissible cargoes under this Charter-Party and bunkers within the trading limits allowed under this Charter-Party. It is the responsibility of the Master and Owners of the vessel lo arrange for any special vaccination required at port of call and to keep on board corresponding valid certificates. Failing this, any time lost to be for Owners' account.

INTERNATIONAL LABOUR ORGANIZATION SAFETY CLAUSES:

It is understood that, if necessary, the vessel will comply with any and ell safety regulations and/or requirements in force at ports of loading and/or discharging particularly the docks regulations of the United Kingdom Factory and Workships Act, the United States Safety and Health Regulations for Longshoring, if called at ports governed by above mentioned regulations. In tie event of any delay to the vessel caused by the reason of the vessel's failure to meet any such safety regulations the vessel shall be off-hire for all time lost.

#### CLAUSE 35

Owners to keep charterers harmless in the respect of the ITF concern.

#### CLAUSE 36

The Owners Guarantee the vessel to be always safe in ballast without required any solid ballast.

#### CLAUSE 37

Deleted

#### CLAUSE 38

Charterers to have the liberty to slowspeed vessel at any speed acceptable to vessels' machinery but instructions to Master in writing only.

2

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 39

Deleted.

### CLAUSE 40

Master/Owners will act in accordance with Charterers' general instruction, as given on delivery.

### CLAUSE 41

Hold cleaning to be paid basis:  sweeping/removal dunnage – US$ 500,-- per such cleaning and/or removal washing including sweeping/removal – US$ 750,– payable to  master directly.

### CLAUSE 42

The Owners guarantee that the vessel is entered for full cover and shall remain entered for duration of the charter in a P + I Club. Cover shall include claim for cargo damage/shortage etc.

Owners PANDI Club is: Russian PANDI Club, controlled in Hamburg.

Owners also guarantee that for the whole duration of this contract the vessel will remain fully covered with a hull and machinery insurance.

### CLAUSE 43

Owners to supply valid deratting certificates on delivery of the vessel. Also valid health certificates covering crew and vessel and game has to cover the whole period of the timecharter. Cost for renewing same and detention to be for Owners' account.

### CLAUSE 44

The Charterers have the liberty of flying their own house flag.

### CLAUSE 45

After suspension of hire from any cause, vessel to be placed again at Charterers' disposal at the same port or position where hire was suspended unless otherwise agreed. If the vessel has been off hire for a total period of 60 days during this Charter Party, Charterers have the option to cancel the balance of the Charter Party provided there is no cargo on board.

### CLAUSE 46

Upon vessel's arrival at 1st loading port vessel to have clean/dry holds to Charterers and their Agents satisfaction. If bagged agriculture products are being loaded, then vessel to be thoroughly cleaned, washed and dried and vessel to be acceptable to the full satisfaction of U.S.D.A. and N.C.B. inspectors as ready in all respect in holds to receive such products.

### CLAUSE 47

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shorelabour and/or tug and/or pilot assistance because of the vessels flag or ownership or management or the wages or conditions of employment of her officers and or crew

3

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 47 – Cont'd

or of the wages end,/or conditions of employment or because of the previous trading of the vessel or any other vessel as aforesaid, hire shall cease for the time thereby lost.

### CLAUSE 48

With reference to line 58 - hire to be telegraphically remitted to Owners bank being:

Beneficiary name: WCL Limited
Bank's address: LATEKO BANK, 21 E.Birznieka-Upisha Street, Riga, Latvia
Acc: LV34LATB0006020080134
SWIFT: LATBLV22

To offset errors Owners are to give the Charterers 48 hours grace before having the power to exercise their rights under Clause 5.

### CLAUSE 49 - PERFORMANCE CLAUSE

If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shell immediately investigate and take appropriate steps to correct the situation.

### CLAUSE 50

The Owners warrant that the vessel is suitable for grab discharge, as far as a tweendecker can be. Vessel has a full tweendeck on board. Charterers have the privilege to use bulldozers during loading and discharging provided weight of same does not exceed the tank top resp. tweendeck strength of the vessel. Charterers are not allowed to use spider grabs.

### CLAUSE 51

Charterers and or their supercargo and/or their surveyor to have free access to the engine room and the bridge.

### CLAUSE 52

Owners grant that during the currency of this charter, they will comply fully with any legislation enacted in respect of oil pollution by any government, department thereof or other authority. If there is any delay to the vessel, or any extension of the voyage occurs from failure to comply with said act, rules, regulations for oil pollution, the vessel to be considered off-hire for the period of such delay of extension.

### CLAUSE 53

Watchmen for the vessel to be for Owners' account, if ordered by the Master and for cargo to be Charterers' account, if ordered by Charterer. Compulsory watchmen or compulsory garbage removal at any port during this Charter Party to be for Charterers' account. Charterers have full cargo rights on and under deck - always within Master's discretion - in accordance with Department of Trade and Industry or equivalent authority regulations at loading pod(s). In the event of any dispute arising in connection with deck cargo, a Lloyds surveyor or equivalent to be appointed for charterers' account and his ruling to be binding on both parties. Cargo carried on deck without liability for loss and/or damage whatsoever caused.

4

**RIDER CLAUSES TO CHARTER PARTY OF**
**M.V. "LUBAVA"**
**DATED LONDON, 7TH NOVEMBER 2006**

### CLAUSE 54

In no case shall Charterers be responsible for any act of smuggling by any member of the crew and for stowaways. Any fines whatsoever applied to the vessel by the authorities and/or customs in connection with the above to be for Owners' account. In addition any time lost to be for Owners' account.

### CLAUSE 55

The below cargoes shall always be excluded:
Bone meals and bone scraps, livestock, asbestos or goods after asbestos forming, turnings and shavings, tar in bulk, asphalt in bulk (if drummed to be in new steel drums), bitumen, cement in bulk, oily scrap, motor blocks, directly reduced iron ore, hides, logs ex water, radioactive and nuclear materials except what is contained in measurement/medical instruments, zinc ash, glass in crates.

Charterers are permitted to load appendix-b cargoes as per the ship's valid certificate of compliance for the carriage of solid bulk cargoes, provided that requirements of the BC Code are observed.

For sulphur in bulk - if necessary charterers will arrange for whitewashing of holds should this be required by shippers and/or authorities.

If strapping/bagging is required charterers will arrange for same in their time and at their expense knowing that vessel has no grain bulkheads available.

Charterers are permitted to load all IMO classified cargoes (except IMO 7) provided same being loaded, stowed and discharged according to IMDG code.

Any extra equipment to be supplied and paid for by Charterers, I.M.O. Clause 7 always deleted except if part of equipment of Medicine/Oil Industry.

### CLAUSE 56

The Master shall keep a record of all Charterers' gear lashing materials, equipment and/or stores supplied by Charterers to the vessel end to maintain same in good condition. Such gear, lashing materials, equipment and/or stores shall be redelivered to Charterers prior to redelivery of the vessel to Owners, or, if requested by Charterers, at any time during the period of the charter in like good order and conditions (ordinary wear and tear excepted) Charterers to make their own arrangements with Master/Crew as to lashing/unlashing of cargo on and/or under deck.

### CLAUSE 57

Should the vessel, due to reason for which owners or their servants are to blame, be arrested during the currency of this Charter Party at the suit of any person having or purporting to have claim or any interest in the vessel, hire under this charter Party shall not be payable in respect of any period whilst the vessel remains unemployed as a result of such angst, i.e. the state to arrest having no bearing on hire unless the vessel be prevented from working thereby. If and when the vessel is off hire under this clause, bunker expenses for the off hire duration to be for Owners' account.

5

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 58

Owners agree to call Malongo terminal provided that charterers shall take out and, in their name and at their expenses, maintain at all material times and throughout the duration of these calls a policy of insurance with Lloyds underwriters in respect of loss and or damage to the vessel and for which charterers are legally liable up to vessel's normal insurance sum of   EUR 2,500,000 the conditions of the insurance incl. the liability costs and expenses which may be incurred by the charterers by reason of delay, detention, loss of use or hire of the chartered vessel provides such losses follow an accident to the vessel for which the charterers are legally liable.

### CLAUSE 59

The charterers have the option to monitor the vessel's performance through a weather company, appointed by the Charterers at Charterers expense. Master to give passage information including coordinates, condition of the sea and wing, course and speed on the daily basis provided the same is the requested by the weather company in the due course.

### CLAUSE 60

New Jason Clause, Baltime 1939 War clause, Both-To-Blame Collision clause, to be considered fully incorporated in this Charter Party and be included as appropriate in Bills of Lading issued under this Charter Party. USA Paramount Clause, Canadian Clause Paramount or applicable Clause Paramount incorporated the Hague Visby Rules and Provisions for General Average to be incorporated in all Bills of Lading issued hereunder.

### CLAUSE 61

Any liability to third parties for cargo claims shall be borne by Head Owners, Disponent Owners and time Charterers, in accordance with the Inter-Club N.Y.P.E agreement, as amended May 1984. Under no circumstance may Charterers deduct or withhold any amounts from the T/C-hire for alleged cargo claims.

### CLAUSE 62

Deleted.

### CLAUSE 63

Charterers have the option to demand that Owner/Master fit one or more hatches with marine tape or equivalent tape. Such tape to be supplied and paid by the Charterers. The fitting of any tape to be carried out by the crew in accordance with instructions of tape manufacturers before vessels' sailing and same to be done in Charterers time and at Charterers expenses.

### CLAUSE 64

Charterers to be responsible for stevedoring damage. Should any damage be caused to the vessel of her fittings by the Charterers or their stevedores, the Master and/or the Owners shall give voyage as long as vessel is in the written notice to the Charterers and to the party having caused the damage, within 24 hours of occurrence, (or latest prior completion of each single voyage as long as vessel in the Malongo trade) failing which Charterers cannot be held responsible. Master to endeavour to obtain written acknowledgement of liability from the party

6

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 64 – Cont'd

having caused the damage. Damage not affecting vessel's seaworthiness to be repaired at Owners' convenience. Damage affecting vessel's seaworthiness to be repaired whilst the vessel is on hire.

### CLAUSE 65

Delivery and redelivery time to be calculated on the basis of GMT.

### CLAUSE 66

Charterers' agent during this timecharter to attend to vessel's usual husbandry matters without charging any separate agency fee, Owners only paying actual expenses involved.

### CLAUSE 67

If steelware cargos are taken by the Charterers for the carriage, The Charterers shall arrange preloading survey with the assistance of survey company which should be preliminary approved by the Owners' P and I insurers, with assistance of a P&I approved survey company.

### CLAUSE 68

In no event shall Charterers procure or permit to be procured for the vessel any supplies, necessaries or services without previously obtaining a statement signed by an authorised representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of the Charterers and not on the credit of the vessel or of her Owners / Disponent Owners and that the furnisher claims no maritime lien on the vessel therefore.

### CLAUSE 69

Any U.S. gross transportation tax - also referred to as the U.S. Tax Reform Act of 1986 -including later changes or amendments, levied on income attributable to transportation under this C/F shall be reimbursed by the Charterers. This is applicable as far as taxes on cargoes/freight and T/C hire payment to the vessel are concerned. Such taxes to be for Charterers' account.

### CLAUSE 70

Basic War Risk insurance Premium to be for charterers' account. If Angola involved, then any additional War Risk Premium to be for Charterers' account same not to exceed the Standard London Lloyds and to be settled against Underwriters invoice. Vessel's H & M value: € 2,500,000.

### CLAUSE 71

Vessel's Description

    "MV LUBAVA"

| | |
|---|---|
| EX NAME(S) | AFROSTAR |
| VSL'S IMO NUMBER | 8410354 |
| VSL'S TLX | 431266730, RUSSIAN CREW |
| VSL'S ICE CLASS | E2 (B1) |

7

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 71 – Cont'd

| | |
|---|---|
| OWNERS' FULL STYLE | WCL LIMITED, BELIZE |
| CLASSIFICATION | GERMAN LLOYD |
| P&I COVERED BY | RUSSIAN P&I POOL |

DIMENSION AND MAIN DATA

| | |
|---|---|
| LENGTH OVER ALL | 88.60m |
| LENGTH BETWEEN P.P. | 80.92m |
| BREADTH MOULDED | 15.67m |
| DEPTH TO MAIN DECK | 8.30m |
| DEADWEIGHT SUMMER | 4.134 |
| DRAFT SUMMER | 6.455m |
| GT/NT | 3120/1733 |

HOLD / HATCHES

| | |
|---|---|
| NUMBER OF HOLD / HATCHES | 1/1 |
| HOLD DIMENSIONS | 51,30x12,50x8,95m |
| TWEENDECK DIMENSIONS | 51,30x12,50x8,95m |
| GRAIN / BALE CAPACITY | 190740 cbft |

STEEL PONTOONS COULD BE USED AS OR CAN BE ERECTED IN THREE POSITIONS: 2700, 4250, 5800 mm FROM TANKTOP; EXCLUDED FORE SECTION OF TWEENDECK COVER, WHICH CAN BE ERECTED ONLY IN MID POSITION

CARGO GEAR

| | |
|---|---|
| TYPE | 2 MMF SLEWING CRANES, COMBINABLE |
| SWL/OUTREACH | 18t / 20.5m,24t / 15.5m,32t / 12.0m |

| | |
|---|---|
| SITUATED | PORT SIDE |

TANK CAPACITIES

| | |
|---|---|
| MDO | 280 mt |
| FRESHWATER | 66 mt |
| BALLAST WATER | 1483 mt |

MACHINERY

| | |
|---|---|
| MAIN-ENGINE | DEUTZ |
| AUX-ENGINE | 2KDH, 1KDH |
| SHAFT GENERATOR | 400KVA |
| BOW-THRUSTER | 184KW |

CONTAINER INTAKE

| | 20' | 40' |
|---|---|---|
| HOLD | 112 | 54 |
| DECK | 144 | 65 |
| TOTAL | 256 | 119 |

**RIDER CLAUSES TO CHARTER PARTY OF**
**M.V. "LUBAVA"**
**DATED LONDON, 7TH NOVEMBER 2006**

CLAUSE 71 – Cont'd

STABILITY EXAMPLES

14TS HOMOG. WEIGHT: 176'

DECK STRENGTH

| TANKTOP | 10MT/M2 |
|---|---|
| HATCH-COVER | 1.5MT/M2 |
| TWEENDECK | 2.0MT/M2 |

SPEED/CONSUMPTION

-SPEED/CONSUMTION:   ABT 11.0 KNOTS ON ABT 6.3 MT MDO, WIND UP TO MAX 3 AS PER BEAUFORT, NO ADVERSE CURRENT, BUT IAC NOT MORE THAT 34DEG TEMP OF THE SEA WATER

-VESSEL BURNING MGO FOR M/E AND HAVE WORKING AUXILARIES ON APPROACHES, SHALLOW WATERS, CONGESTED WATERS, STORMY SEA

-PLUS 0.2 MGO PER DAY FOR BOILER
-IN PORT WITHOUT GEAR  0.5MT MGO
-IN PORT WITH GEAR   1.5MT MGO

BUNKER SPECIFICATION

MGO-DMA SULPHUR WITH MAX 0,2 AS PER ISO 8217 1996 (e)
MDO-DMB BRIGHT AS PER ISO 8217 1996 (e)

ELECTRIC VENTILATION IN HOLD

26 AIR CHANGES PER HOUR BASIS EMPTY HOLDS

ADA & WOG

Owners further confirm that:

Tweendeck covers can be used like the bulkheads, but not as grain bulkheads since there is no parts which are composing bulkheads up to the full height of the hold.

There are no co2 fittings in the hold.

All IMO subject to the observation of the IMDG code requirements on the stowage and segregation.

Vessel is fitted with all SOLAS required means of the communication for the GL Class satisfaction including Inmarsat C (Telex). Vessel fitted with Inmarsat Mini M on board (Fax, Telephone) but same is not activated for reasons.

Vessel to be fully fitted with all container lashing equipment. Vessel to be fitted with semi automatic twist-locks on delivery or latest when being ordered to proceed to USA provided container cargo is nominated.

9

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 71 – Cont'd

Vessel is steel floored.

Vessel to be able to load full homogenous cargo in hold to vessels dwcc without water ballast.

On vessel constants owners advise: awaiting from the master exact, but owners for the safe load calculate 150mt total for stores, spares, constants.

### CLAUSE 72

Deleted.

### CLAUSE 73

This fixture to be kept strictly private and confidential.

### CLAUSE 74

Vessel not to be sold during duration of this c/p.

### CLAUSE 75

"BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005 Edition Jun 2005" to apply on this Charter Party.

### CLAUSE 76

"BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties Edit. Apr 2004" to apply on this Charter Party.

### CLAUSE 77

The Charterers have the option to apply to the Owners for the matter of changing the name of the vessel and such option shall be exercised by the Owners at the Charterers' time an expense provided that the appropriate authorities of the flag and/or bankers having a mortgage on the vessel give joint permission to do this.

All costs and expenses incurred by the Owners in relation to class work, re-issue of class certificates, statutory certificates and the vessel's documents, re-issue of the licenses and additional audit of the vessel in the respect of the ism plus ISPS, security plans review and change of the name in the mortgage, interest of the bank and any other work done by the Owners on behalf of the Charterers shall be at the Charterers' time and expense. The Charterers shall advance the Owners with sufficient funds covering the estimated volume of work to be done in relation to such change. Time lost by the vessel for the above as well to be for the charterers account.

Charterers is responsible, at their time and expense to arrange returning previous name of the vessel prior to the redelivery, provided owners request the same but not later than 15 days prior to estimated ship's redelivery date.

10

## RIDER CLAUSES TO CHARTER PARTY OF
## M.V. "LUBAVA"
## DATED LONDON, 7TH NOVEMBER 2006

### CLAUSE 78

Crew Services

Charterers have the right on agreement of the master to use vessels crew for driving of cranes against US$ 9,-- per man per hour payable directly to master. In an way such services is subject to the term that permitted by the local regulation / authorities, customary for such ports for the such type/size of the vessel. Owners are not responsible for any certification for the such crew and crew working as charterers servants. Driving of cranes for larger pieces to be mutually agreed with master.

### CLAUSE 79

Reefer Container Clause

The Owners shall be responsible for the provisions of electrical power only. The Owners shall endeavour to monitor and record the performance of all such units whilst onboard the vessel in accordance with the Charterers' written instructions and to try to repair and rectify any breakdown, fault, or deficiency which may occur in respect of such units using the resources on board the vessel provided there is Crew available and weather permitting. If repair works are performed, all expenses, spares including Crew man hours shall be for the account of the Charterers and the vessel's Crew shall always be considered as Charterers' servants. If such resources are insufficient, the Owners shall immediately notify the Charterers so that they may take action to obtain any required spares. Charterers to undertake to load/carry only reefer containers in good working conditions having passed a 'pre-trip inspection' by a recognised reefer service company before stuffing and will provide Owners/vessel with thereof on request. In no case shall the Owners and/or Master and/or vessel's Crew be responsible for proper functioning of reefer apparatuses and/or the conditions of the cargo inside the containers.

### CLAUSE 80

No tweendeck pontoons to be loaded under bulk cargo, but it permitted that tweendeck pontoons are stacked all in one stack from mid position up to the top of the coaming as not to be covered with the cargo (not to be stacked on tanktop and more that in one stack) or been erected in the vertical position to serve as bulkheads for the grades separation except on last cover when stacked in hold. It must be understood that the tweendeck can be stacked in hold when loading bulk cargo, but charterers agree not to floor out the tweendeck on tanktop.

### CLAUSE 81

*image skows*

All ~~messages~~ send on board to be copied to open@wcl-ship.com.

### CLAUSE 82

Owners agree to discuss only Owners matters of ships business with Charterer's appointed port agents such as repatriation, spares, cash, b/l's, authorities, damages etc. items which belongs to owners, but not to chartering business such as demurrage rates, freights and other similar items respectively arrangements for loading and/or discharge or other port operation related issues.

11

EXHIBIT "2"

FROM : BRAEMAR SEASCOPE CONTAINERS
    Container S & P    - containers@braemarseascope.com
    Container Chartering  - teu@braemarseascope.com
    London  - +44 20 7535 2867
    Singapore - −65 6536 5702

DATE : 07/12/2007
TIME : 17:55:57
REF : RE35332858


peter / roy obo phil

re mv lubava / acc e&t
  cp dtd 07 nov 2006 + add dtd 14 nov 2007
==

as per telecom, thanks for accepting ows last. plsd to recap asf:

1- present outstanding (about euro 59.000 incl owners items setubal of
  about 7.000 or which vouchers has not yet been received) due to
  chtrs to be settled asf:
  -- payment of euro 30.000 to be paid by owners and received by
    timecharterers latest 21st december, 2007 close of banks at 15.00
    hours danish time.
  -- balance about −/- euro 29.000 to be adjusted and settled via
    next hire after delivery of vessel on-hire after drydocking
  -- ows' expenses occured at port julianehaab, greenland approx
    euro 17.000 (this amount is subject to original supporting
    vouchers and to be adjusted upon receipt of supporting vouchers
    by ows) to be paid by the ows to the agents directly after
    receipt of original supporting vouchers from agents
    owners to deal with agents royal arctic line themsleves and ask
    for eventual credits directly.
    (as vessel was off hired so all was arranged between owners and
    ral directly).
  charterers reserve their right to debit owners for ows' expenses at
  julianehaab in case charterers
  charged by agents for the same (but only in case ows expenses were
  not settled directly between ows and agents)

2- bunker consumed during period while vessel is off-hire
  (greenland-baltic) to be paid with the 2nd hire after delivery of
  vessel on-hire after drydocking

3- owners agree to extend charter for additional period of 3 months
  +/- 10 days in chopt starting from the date/time of delivery of
  vessel on-hire after drydocking

4- owners have option, at their own benefit, to employ the vessel
  within continent/baltic before entering drydock but vessel to be on
  drydock by latest 4th january, 2008 and no further employment after
  4th of january, 2008 to be fixed by owners.

5- charterers renouce their right to order vessel back to her position
  (julinahaab) where vessel came off-hire.

6- charterers agree to take vessel back in t/c after drydocking dop
  docking port one icefree baltic or continent.

7- should vessel, before she actually re-enter the timecharter to charterers suffer damages or become partial or total loss or similar owners as per charterparty understake to re-pay charterers any sum due immediately upon request.

addendum dated 14 nov 2007 to be considered as null and void

+

sgo pls confirm in line with yr file and will draw up final addendum

Brgds,

Roy Edkins
Tel: +44 (0)207 535 2867
Skype: roy.edkins
Braemar Seascope Ltd - Containers

This e-mail and any attachments are strictly confidential and intended for the addressee only. If you are not the named addressee you must not disclose, copy or use the information contained herein and you should notify the sender as soon as possible. Any views expressed in this message are those of the individual sender and not of Braemar Shipping Services Plc., except where the message states otherwise. This e-mail and any attachments are believed to be free from viruses but it is your responsibility to carry out all necessary virus checks. Braemar Shipping Services Plc. accepts no liability for any damage caused by any virus transmitted by this e-mail. Please note that replies to this email address are treated as confidential but may be made accessible by, or distributed to, any member of staff within Braemar Shipping Services Plc.

Registered in England No 1020997 : VAT Registration No 503295565.

**UNQUOTE**

**Confidentiality: This e-mail is intended for the person(s) named above. It may contain information that is confidential or legally privileged.**
**If received in error, please delete it from your system and notify sender.**